UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

LONNIE DONELL PERKINS,

    Plaintiff,

v.

L. CHRONES, Director, California Department of Corrections; ROBERT HOREL, Former Warden, Pelican Bay State Prison (PBSP); FRANCISCO JACQUEZ, Warden (PBSP); K. BRANDON, Captain at PBSP; McMillan, Lieutenant at PBSP; B. THORNTON, Correctional Officer at PBSP; A. HEDGPETH, Warden at Kern Valley State Prison (KVSP); C. J. CHRONES, Chief Deputy Warden, KVSP; J. R. GARZA, Lieutenant, KVSP; O. C. HARRIS, Correctional Sergeant, KVSP; J. OSTRANDER, Captain, KVSP; R. CRUM, Correctional Officer, KVSP; C. PFEIFFER, Correctional Counselor II, KVSP; R. CLEMONS, Correctional Officer, Los Angeles County (LAC); EVERETTE W. FISCHER, Special Agent, CDCR; G. WILLIAMS, Special Agent, CDCR; McGRIFF, Special Agent, CDCR; K. J. ALLEN, Appeals Examiner, CDCR; and N. GRANNIS, Chief of Inmate Appeals Branch, CDCR,

    Defendants.

No. C 09-5855 PJH (PR)

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; STAY AND REFERRAL TO MEDIATION**

    This is a civil rights case filed pro se by a state prisoner, Lonnie Perkins ("Perkins") under 42 U.S.C. § 1983. Defendants' motion for summary judgment is currently before the court. Having reviewed the parties' papers, the exhibits, and having carefully considered the relevant legal authority, for the reasons set forth below, the court DENIES defendants' motion.

**PROCEDURAL BACKGROUND**

In his original complaint filed December 15, 2009, Perkins presented two groups of claims: one that his due process rights were violated in connection with his validation as a member of the Black Guerilla Family ("BGF") prison gang, and one that his rights were violated when he was not allowed to mail out a portion of an autobiography he was drafting. In its February 16, 2010 initial review order, the court dismissed the validation claims as improperly joined and allowed the claims involving the autobiography to proceed against defendants Thornton, Brandon, McMillan, and Allen, movants here. It dismissed the autobiography claims against defendants Jacquez, Chrones, Horel and Grannis as impermissible respondeat superior claims.

On June 7, 2010, Perkins filed an amended complaint in which he clarified that he was raising both First Amendment and due process challenges to the ban on sending out his autobiography, and the court subsequently granted leave permitting the filing of the amended complaint. In that amended complaint, Perkins seeks injunctive and declaratory relief, in addition to damages.

On September 29, 2011, the court denied in part and granted in part a motion for summary judgment by the remaining defendants, Thornton, McMillan, Allen, and Brandon. The court granted summary judgment for defendants on the due process claim, and denied summary judgment as to the First Amendment claim. Because it appeared that it might be possible to resolve the case on motion, the court set deadlines for further summary judgment motions. Defendants subsequently renewed their motion for summary judgment.

On July 11, 2012, the court denied Perkins' motions to stay the proceedings pending his completion of discovery and for appointment of counsel, and granted defendants' motion to stay discovery pending a ruling on qualified immunity. Additionally, in that same order, the court noted that after defendants' motion for summary judgment was filed, the Ninth Circuit decided *Woods v. Carey*, 684 F.3d 934, 940-41 (9th Cir. 2012), in which it held that it is not sufficient to give the notice required by *Rand v. Rowland*, 154 F.3d 952, 953-954 (9th Cir. 1998) (en banc), prior to the time a motion for summary judgment is filed.

This court thus gave the required notice in that order, after the motion for summary judgment was filed but before Perkins had filed his opposition.

Perkins subsequently filed an opposition, along with a motion to reconsider the court's July 11, 2012 ordering denying his motion to stay the proceedings until he completed discovery and denying his request for counsel. Defendants did not file a reply.

## DISCUSSION

### I.    Defendants' Motion for Summary Judgment

Defendants now move for summary judgment on the remaining First Amendment claim, asserting two grounds: first, that the withholding of Perkins' autobiography did not violate his First Amendment rights on the merits; and second, that they are entitled to qualified immunity.

### A.    Factual Background

Perkins has not provided a declaration or any other materials in opposition to the motion for summary judgment, only argument. *See* Opp'n 1-4. His amended complaint, which can serve as a declaration because it is verified, *see Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995), does not contradict the following facts.

In October 2006, Perkins was validated as an active associate of a prison gang named the "Black Guerilla Family," or "BGF," and as a result, has been housed in Pelican Bay's Security Housing Unit ("SHU") since February 2009. McMillan Decl. at ¶ 7; FAC at 7:25-26. On February 12, 2009, Perkins attempted to mail out of the prison a 140-page document, which he claims is a portion of his autobiography. Thornton Decl. at ¶ 4; FAC at 4. The autobiography was addressed to Lolita Booker in Sauk Village, Illinois. Defendant Thornton disallowed it on grounds that it promoted gang activity and because it was addressed to an address that defendants claim had previously been the source of incoming mail promoting gang activity. *Id.* at ¶¶ 5-7. Perkins asserts that defendant Brandon authorized Thornton's action. FAC at 6. Perkins filed an administrative appeal asking to be allowed to mail out the autobiography. McMillan Decl. at ¶ 17. Defendant McMillan denied the appeal. *Id.* at ¶¶ 18, 30. Defendant Allen denied the appeal at the director's level.

FAC at 8. The autobiography has been filed under seal with the court. Barnts Decl., Exh. A (under seal).

In addition to the above undisputed facts, the court notes there are additional factual issues pertinent to the instant motion, which are undeveloped and also likely disputed. First, as discussed in more detail below, defendants assert that the mailing address utilized by Perkins for the withheld autobiography was an address from which "incoming mail had previously been stopped. . . [because] there had been third party mail correspondence from another inmate describing criminal activity." McMillan Decl. at ¶ 20. Presumably, given that he claims he was mailing the manuscript to his mother, Perkins disputes this fact.

Second, there are facts suggesting that the mailing at issue in this motion was actually the second time that Perkins had mailed out, or attempted to mail out, a portion of his autobiography. Perkins asserts that he had previously successfully mailed out a prior portion of his autobiography to the same person at the same address. Defendants neither confirm nor deny that the prior mailing occurred, but simply acknowledge that Perkins claims that is the case and suggest that the first portion must not have described gang activity. McMillan Decl. at ¶ 32.

### B.   Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the moving party has met this burden of production, the nonmoving party must go beyond the

pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id.*

### C. Merits of First Amendment Claim

Prisoners enjoy a First Amendment right to send and receive mail. *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)). A prison, however, may adopt regulations or practices which impinge on a prisoner's First Amendment rights as long as the regulations are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The *Turner* standard applies to regulations and practices concerning all correspondence between prisoners and to regulations concerning incoming mail received by prisoners from non-prisoners. *Thornburgh*, 490 U.S. at 413.

In the case of outgoing correspondence from prisoners to non-prisoners, however, an exception to the *Turner* standard applies. Because outgoing correspondence from prisoners does not, by its very nature, pose a serious threat to internal prison order and security, there must be a closer fit between any regulation or practice affecting such correspondence and the purpose it purports to serve. *Id.* at 411-12. Censorship in such instances is justified only if (1) the regulation or practice in question furthers a legitimate penological interest, and (2) the limitation on First Amendment freedoms is no greater than necessary to further the particular government interest involved. *Procunier v. Martinez*, 416 U.S. 396, 413 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. at 413-14; *see, e.g., Witherow*, 52 F.3d at 265-66 (regulation requiring visual inspection of outgoing mail from inmates to certain public officials closely related to legitimate penological interest of preventing prisoners from disseminating harmful or offensive materials and avoids unnecessary intrusion). This is not, however, a "least restrictive means" test. *Id.* at 265

Here, defendants argue that the confiscation of Perkins' autobiography was appropriate under state regulations and prison policy, and that Perkins' First Amendment rights were not violated. Defendants cite to numerous state regulations governing prison

5

"gangs" and the mailing of gang-related materials from prison, and contend that those regulations further a substantial governmental interest in prison security and order, and that the regulations themselves are no more restrictive than necessary to further the government's interest in maintaining prison security and order. *See* Cal. Code Regs tit. 15, § 3000 (defining "gang"); § 3023 (prohibiting promotion of and assistance to gangs); §§ 3006 and 3136 (prohibiting the possession and mailing of gang-related materials and other "contraband").

In his declaration, defendant McMillan describes the pertinent regulations, along with CDCR's policies regarding the screening of inmate mailing. He notes that

> CDCR closely monitors attempts by prison gang members to communicate with other gang members because of the potential for criminal activity. CDCR's policy of isolating and confining gang members in the [Security Housing Unit] SHU is one method of controlling gang activity. Another method is to closely monitor gang member's correspondence with outside third parties who may assist a gang member to covertly communicate with other gang members.

McMillan Decl. at ¶ 11. Additionally, a copy of the Pelican Bay Operations Manual is attached to McMillan's declaration, which apparently governs the procedures for sorting and screening mail at the prison. Unfortunately, defendants have not adequately pinpointed or cited to the relevant portions of that manual. However, the court notes that as defendants assert, the manual itself states that as a general policy, "[t]he sending and receiving of mail by inmates will not be unduly restricted or impeded, nor will the privacy of such correspondence be invaded, except as may be required to prevent physical injury or threat to persons and to maintain the security of the prison." McMillan Decl., Exh. A at 1.

Defendants appear to argue that both on their face and as applied, the regulations do not violate the First Amendment because they further a substantial governmental interest, helping to maintain prison security and order. Defendants contend that Perkins' autobiography constituted "contraband" in accordance with title 15 of the California Code of Regulations, § 3006(c), which provides in pertinent that:

> (c) Except as authorized by the institution head, inmates shall not possess or have under their control any matter which contains or concerns any of the following:

6

> . . . . .
>
> (3) Contraband, or sending or receiving contraband.
>
> . . . .
>
> (5) Plans to disrupt the order, or breach the security, of any facility.
>
> . . . .
>
> (16) Material that is reasonably deemed to be a threat to legitimate penological interests.

In support of this contraband characterization, defendants argue that the autobiography "includes descriptions of gang activities that [Perkins] had been involved in, which related to other inmates and victims in [sic] events that occurred during his incarceration," and that it "would serve to further the promotion of gang activity." In his declaration, defendant McMillan provides four examples of how defendants contend the autobiography promotes gang activity. In those examples, McMillan quotes from portions of the autobiography (with redactions), and explains as follows:

> 23. One example of how the autobiography promotes gang activity can be found at the first paragraph on page 252 (AGO 13) of the autobiography that states, 'I wasn't totally surprised that [Person A] would try a stunt like that! But I had kept it clean with [Person B] and told him that me and [Person A] had spoke about the situation regarding [Person C] because everyone know that I had a baby with his sister, so when he asked me how I felt about it I replied that 'I don't condone that type of get down with nobody, family or not'! I told [Person B], 'Look you don't have to worry about me doing nothing to you out here, but if you get caught up and go jail you're going to have to answer for what you did'! He said that 'he understood'! End of discussion. . . .' Here, Perkins is talking about an open threat of violence to an individual if that person ever goes to prison. This paragraph portrays how street gang activities can affect and cause disruption and violence within prisons.

McMillan Decl. at ¶ 23.

He provides another excerpt:

> 24. Another example of how the autobiography promotes gang activity can be found starting at the eighth line from the bottom of page 256 (AGO 17), beginning with '. . . by me witnessing it first hand I started becoming more involved with 'Hoover activities,' after all this was my 2nd family and although I would jump in front of a bullet for my blood family, I would only take equal changes [sic] with my Hoover family by being posted with them at any given moment (because it could go down) . . . .' This paragraph show that, by being willing to take a bullet for his Hoover 'family,' which is not his blood/biological family, Perkins is promoting gang activity by

7

demonstrating how strong ties are among gang members.

*Id.* at ¶ 24.

Another excerpt follows:

> 25.   Another example of how the autobiography promotes gang activity can be found on page 266 (AGO 27), the paragraph that states, 'Most of the homeboy's [sic] from 74th and 83rd knew what [Person A] had done in regards to telling ([Person B] that drama [Person B] in turn told his grandmother and aunt) so with the picnic coming and [Person D] back out, the stage was set for some drama, I just didn't know how much, but it would be the first time I had seen [Person A] since I had been home (but that was about to come to a head). . . .' This paragraph is an example of gang activity because if a gang member knew who Person A was and the 'drama' he told Person B, that may cause someone to want to retaliate as a result of these events.

*Id.* at ¶ 25.

Finally:

> 26.   Another example of how the autobiography promotes gang activity can be found on page 283 (AGO 44), the paragraph that states, 'As soon as I got back on the yard I told the two older homies about the phone call, [Person E] from 74th and [Person F] 83rd, [Person E] had been snitched on by another older ex-homie from our block who had gotten caught with a few 'rocks' and told the cops, 'he knew about some murders.' [Person F] was the jail house lawyer of the crew and was like a favorite uncle. . . .' This paragraph furthers gang activity because it may cause retaliation if gang members, either on the streets or in prison, knew about the events described in this paragraph.

*Id.* at ¶ 26.

As noted, defendants also contend that any limitations to First Amendment freedoms imposed by the regulations are not unnecessarily broad. Citing to defendant McMillan's declaration, defendants assert that there are no obvious, easy alternatives to Pelican Bay's screening policies. They further assert that the limitations on freedoms imposed by the regulations, including § 3006(c), set forth above, and § 3023, governing gang activity, are not unnecessarily broad.[1]

---

[1] California Code of Regulations, title 15, section 3023 provides that:

(a) Inmates and parolees shall not knowingly promote, further or assist any gang as defined in section 3000.

(b) Gangs, as defined in section 3000, present a serious threat to the safety and security of California prisons.

8

Additionally, defendants contend that the address to which the autobiography was mailed constituted what is considered a "drop box," an address outside of prison by which mail is surreptitiously routed from one inmate to another. McMillan Decl. ¶ 12. They further note that incoming mail from the address to which Perkins sent his autobiography had previously been stopped due to suspected gang activity. McMillan Decl. ¶ 20; Thornton Decl. ¶ 7. Defendants note that Perkins contends that the autobiography was being mailed to his mother, but that his mother lives in Compton, California, not Sauk Village, Illinois, and that her name is not Lolita Booker. McMillan Decl. ¶ 19.

Finally, defendants argue that the fact that prison officials previously allowed a different, earlier portion of Perkins' autobiography to be mailed out demonstrates that the regulations were not applied in an overly broad manner. They suggest that it was only the portion (the current portion at issue in this motion) that promoted gang activity, which was withheld under the regulations and prison's policy.

Perkins' opposition is less helpful than his FAC in setting out his position. In his FAC, Perkins counters that his autobiography did not mention prison gang activity, noting that it was a "non-fictional story based on Perkins' life, of events that occurred approximately thirteen years in the past," and that the events in the autobiography took place years before he was validated as a Black Guerilla Family member in prison in 2006.

Turning to the merits of Perkins' First Amendment claim, the court notes that there are two bases that defendants have proffered in support of their confiscation and withholding of the autobiography. The first rationale pertains to the *content* of the autobiography, and the second rationale concerns the *address* to which the autobiography was mailed.

As for the content of the autobiography, it is defendants' burden to show that there is no genuine dispute of fact that the confiscation furthered a substantial governmental interest of security, order, and rehabilitation, and that confiscating the autobiography was

---

(c) For the purpose of specific gang participant identification, the department categorizes gangs into prison gangs and disruptive groups as defined in section 3000.

9

no more than was necessary to protect that interest. *See Procunier*, 416 U.S. at 413, 415 (burden is on prison authorities to show elements). Here, the court is unable to conclude that either requirement is satisfied.

First, defendants assert that the autobiography "promoted" BGF gang activity, and thus that the confiscation furthered a substantial governmental interest in security. Following its review of the four exemplars from Perkins' autobiography selected by defendants, the court is unable to conclude that those four portions - let alone the autobiography as a whole - "promote" gang activity. At best, some of the excerpts selected by defendants appear to be "gang-related," but defendants neither argued nor established that this is the equivalent of "promoting" gang activity.

As for the first excerpt, paragraph 23 of the McMillan declaration, the excerpt does not appear to the court to be either gang-related or to promote gang activity. Regarding the second excerpt, paragraph 24, the court notes that it does appear to be gang "related," but does not necessarily "promote" gang activity. In fact, it seems to suggest that Perkins would not subject himself to the same danger for what is presumably a gang that he would for his own "blood" family. As for the third excerpt, it is unclear to the court whether the excerpt is gang-related, let alone whether it promotes gang activity. Finally, regarding the fourth excerpt, the court agrees that it appears to be gang-related, but again the court cannot conclude that it actually "promotes" gang activity.

The court notes that defendants have also emphasized that the portions of the autobiography upon which they rely may constitute "veiled" or "disguised attempts" to promote gang activity. However, given the First Amendment concerns at stake and the fact that it is defendants' burden to establish and explain how the autobiography implicates its substantial governmental interests, the court declines to defer wholly to such an expansive and insufficiently supported view of what constitutes the "promotion" of gang activity. Accordingly, the court finds that a triable issue of fact exists as to whether the autobiography promotes gang activity.

Second, the court finds that there is a triable issue of fact regarding whether the

wholesale withholding of the autobiography constituted an action "no greater than [wa]s necessary or essential to the protection of the particular government interest involved." *See Procunier*, 416 U.S. at 413. Given that it appears that the first half of Perkins' autobiography was mailed out, the court is unconvinced that redaction of any assailable portions - a less restrictive measure - was not an option.

Turning then to the "drop box" rationale, the court is similarly unable to conclude that this constitutes an alternative basis by which defendants are entitled to summary judgment. The record is incomplete on this issue and does not permit the court to ascertain whether a triable issue of fact exists. For example, the following pertinent facts and/or evidence are absent from the record:

(1) details regarding Perkins' mailing of the first autobiography including date of mailing, addressee, and address to whom mailing was sent;

(2) details regarding defendants' "drop box" determination, including the date when it was determined that the address currently used by Perkins constituted a "drop box," and an explanation regarding what is meant by defendants' assertion that the address was one "where there had been third party mail correspondence from another inmate describing criminal activity;" McMillan Decl. at ¶ 20; and

(3) if the address had previously been determined to be a "drop box" *prior to Perkins' first mailing*, an explanation regarding why the first mailing was not stopped or withheld on this basis as well.

For these reasons, defendants' motion for summary judgment, to the extent based on the drop box rationale, is also denied on this basis.

In sum, defendants' motion for summary judgment as to the merits of Perkins' First Amendment claim is DENIED.

**D.    Qualified Immunity**

As noted, defendants further argue that even if their conduct was found to be unconstitutional, they are entitled to qualified immunity.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law;" defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

Claims of qualified immunity require a two-step analysis. *Pearson*, 555 U.S. at 236 (overruling the *Saucier* requirement that courts first determine whether a constitutional violation had occurred, and only then proceed to consider whether the right was clearly established). The first prong is whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury," show that the defendant's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. The second is whether, if the allegations could make out a constitutional violation, the right was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. In sum, a court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he or she confronted. *Pearson*, 555 U.S. at 236.

Like their merits arguments, defendants argue that they are entitled to qualified immunity because Perkins has not shown that their actions violated his constitutional rights. Alternatively, even if defendants' actions could be deemed unconstitutional, they argue that

they are entitled to qualified immunity because it would not have been clear to a reasonable official that confiscating and withholding the mailing of the autobiography was unlawful. In support, they cite to the regulations that prohibit inmates from possessing contraband and to the fact that the outgoing address for the autobiography was already considered a "drop box."

In his opposition, Perkins summarily opposes qualified immunity, and asserts that McMillan misrepresents facts in his declaration, claiming only that McMillan's characterization of the "Crips, Bloods, and Hoovers" as prison gangs in his declaration is erroneous because they are in fact street gangs.

As for the first prong of the qualified immunity inquiry, for the reasons set forth above, the court concludes that there are triable issues of fact as to whether the autobiography promotes gang activity, thus implicating a substantial governmental interest in security, and also regarding whether confiscation of the entire manuscript constituted action "no greater than [wa]s necessary or essential to the protection of the particular government interest involved." *See Procunier*, 416 U.S. at 413. Accordingly, taken in a light most favorable to Perkins, the facts alleged preclude a finding that defendants did not violate Perkins' constitutional rights.

Moreover, for the reasons set forth in the section above concluding that defendants are not entitled to summary judgment on the merits of the drop box issue, the court is unable to ascertain from the record at this stage whether qualified immunity is appropriate on the first prong as to the drop box rationale.

Turning to the second prong, the court finds that defendants are not entitled to qualified immunity because, again, taking the facts in a light most favorable to Perkins, it is unable to conclude that it would *not* be clear to a reasonable officer that his conduct was unlawful. The court acknowledges that defendants contend that prison officials confiscated Perkins' autobiography on the basis that it promoted gang activity, acting in reliance on the regulations governing prison mail and gang activity, and that prison officials who rely on statutes are generally presumed to act reasonably," unless the statute is "patently violative

13

of fundamental constitutional principles." *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 881 (9th Cir. 2002). Here, though, the issue is not defendants' reliance on the regulations and prison policies, but instead defendants' application of the regulations and mail screening standards to the particular portion of the autobiography in this case. Again, as discussed above, regarding the content of the autobiography, defendants' conclusions that the autobiography "promoted" gang activity and that blanket confiscation of the entire document was required are questionable and raise triable issues of fact. Furthermore, as for the drop box rationale, there is an insufficient record, and the court is unable to ascertain what information was available to the officers regarding the address utilized by Perkins in order to properly assess the second prong of the qualified immunity inquiry. Qualified immunity may indeed be warranted on the basis of the drop box finding, but the record in support of that finding is insufficiently developed at this time.

For the above reasons, defendants are not entitled to summary judgment on their qualified immunity defense.

## II.   Perkins' Motion to Reconsider

The court GRANTS IN PART Perkins' motion to reconsider its July 11, 2012 order denying his motion to stay the case to allow him to conduct discovery. Defendants are ORDERED to provide Perkins with a copy of the confiscated autobiography **within ten days of the date of this order** to enable him to prepare for the mediation ordered below. The court DEFERS ruling on Perkins' motion for reconsideration as it pertains to any requests for additional discovery and to his request for appointment of counsel. In the event the case does not settle, the court will then rule on the remaining deferred issues from Perkins' motion for reconsideration.

## III.   Further Proceedings

Having denied defendants' motion, this case is referred to Magistrate Judge Nandor Vadas pursuant to the Pro Se Prisoner Mediation Program. Judge Vadas shall conduct mediation proceedings and file a report thereafter. The proceedings are confidential and no statement made therein will be admissible in any proceedings in the case, unless the

parties otherwise agree. In view of the referral, further proceedings in this case are **STAYED.**

If the case is not settled, the court will enter a new scheduling order for further proceedings. The clerk shall mail a copy of this order to Magistrate Judge Vadas in Eureka, California.

## CONCLUSION

Defendants' motion for summary judgment (docket # 49) is **DENIED** on the merits and on qualified immunity grounds. Perkins' motion to reconsider (docket # 65) is **GRANTED IN PART** as set forth above, and the court reserves ruling on additional issues contained in that motion until after the mediation.

**IT IS SO ORDERED.**

Dated: September 30, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge